IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

CORNELIUS ETHERIDGE,           *
                               *
      Plaintiff,               *
                               *
vs.                            *    CIVIL ACTION 08-0357-WS-B
                               *
MICHAEL J. ASTRUE,             *
Commissioner of                *
Social Security,               *
                               *
      Defendant.               *

## REPORT AND RECOMMENDATION

Plaintiff Cornelius Etheridge ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for period of disability and disability income benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 416 et seq. Oral argument was waived. (Docs. 17, 18). Upon careful consideration of the administrative record, the oral arguments and the memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED AND REMANDED.**

## I. Procedural History

Plaintiff filed an application for disability benefits on May 8, 2002, alleging disability since October 30, 2001 due to pain in his back and left leg, and shortness of breath. (Tr. 79-82, 94-104). Plaintiff's application was initially denied on July 30,

1

2002 (Tr. 33-34).  Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") (Tr. 58-59).  On August 26, 2003, ALJ B. William Lawson ("ALJ Lawson") held an administrative hearing which was attended by Plaintiff, his attorney, and a vocational expert.  (Tr. 409-428).  On September 25, 2003, ALJ Lawson issued an unfavorable decision.  (Tr. 35-46).  Plaintiff appealed the decision, and on March 8, 2004, the Appeals Counsel ("AC") vacated the September 25, 2003 hearing decision, and remanded the case back to the ALJ with instructions.  (Tr. 49-52).

On December 14, 2004, ALJ Charles Thigpen ("ALJ Thigpen") held a second administrative hearing which was attended by Plaintiff, his attorney, a medical expert and a vocational expert.  (Tr. 429-452).  On February 23, 2005, ALJ Thigpen issued an unfavorable decision.  (Tr. 178-204).  Plaintiff appealed the decision, and on May 13, 2005, the AC vacated the February 23, 2005 hearing decision, and remanded the case back to the ALJ with instructions. (Tr. 205-209).

On January 25, 2006, ALJ Thigpen held the third administrative hearing which was attended by Plaintiff, his attorney, a medical expert and a vocational expert. On August 8, 2006, ALJ Thigpen issued the third unfavorable decision.  (Tr. 11-29).  Plaintiff appealed the decision, and on May 30, 2008, the AC denied Plaintiff's request for review.  Thus, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R.

§ 404.981.  (Tr. 6-9).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.  <u>Issues on Appeal</u>**

A.  Whether the ALJ erred in failing to find that Plaintiff meets Listing 12.05C.

B.  Whether the ALJ erred in determining Plaintiff's RFC, and in finding Plaintiff could perform past work that requires abilities in excess of his RFC.

C.  Whether the ALJ erred in addressing evidence not included in the record.

D.  Whether the ALJ erred in failing to apply the pain standard.

E.  Whether the ALJ erred in finding that Plaintiff engaged in work during October of 2005.

**III. <u>Background Facts</u>**

Plaintiff was born on October 11, 1961 and was 44 years old at the time of the January 2006 administrative hearing (Tr. 79, 372, 412).  He has a high school education with vocational training in carpentry.  (Tr. 101).  He has past relevant work experience ("PRW") as a cook and truck driver in the Army[1], a laborer in a meat packing facility, and a laborer in road construction.  (Tr. 96, 110, 264, 415).  Plaintiff indicated that he became disabled on March 1, 1999, while working at Auto Zone.  According to Plaintiff, his back, hips and head cause him the most problems when working.  (Tr. 421).

At the August 26, 2003 hearing, Plaintiff testified that he has

_____

[1]Plaintiff testified that the highest rank he had in the military was E4.  (Tr. 386).

migraine headaches two to five times a week, and that he takes Tylenol or Motrin (Tr. 417-418).  He further testified that he has unbearable pain in his lower back, hip, and down into his leg, that he takes medication for the pain, and that the medication makes him drowsy. (Tr. 419-420).  According to Plaintiff, he can walk about a block, stand about 10-15 minutes at a time, and sit about 30 minutes at a time.  Plaintiff testified that he could not perform a job which required him to sit all day, and that a typical day for him consists of performing a little housework and lying down to stop his pain.  (Tr. 420-423).

At the December 14, 2004 hearing, Plaintiff testified that he attempted to return to his construction job after October 2001, but was unable to do so because of the pain.  Plaintiff again testified that he cannot work because of migraine headaches and pain in his back, leg and knee. (Tr. 436).  Plaintiff testified that at the suggestion of a VA doctor, he uses a cane, and placed his pain level at seven or eight on a scale of one to ten.  (Tr. 437-438). Plaintiff testified that he can walk about a block, stand about five minutes at a time, and sit for about 10 to 20 minutes, and that he has to lie down for about two to three hours after he takes his daily pain medication. (Tr. 439-440).  According to Plaintiff, he cannot perform any of his prior jobs because they all required a lot of lifting, bending and standing.  (Tr. 441-442).

At the January 25, 2006 hearing, Plaintiff testified that he

4

attempted to work for Guardrail Incorporated for about a month in 2004 by flagging traffic; however, he was unable to do the job because it required lifting guardrails. (Tr. 373-374). He also testified that he goes to the VA for treatment of the pain in his back, left hip and left leg, and that he receives physical therapy, but that it does not help. (Tr. 378). Plaintiff testified that the medication he gets from the VA helps some with the pain but makes him sleepy. (Tr. 378).

According to Plaintiff, he lies down two or three hours a day on a sofa bed, and sometimes watches television. (Tr. 379). He also testified that he can walk two or three blocks and sit 20 to 30 minutes, and that he performs household chores about two times a week. Plaintiff indicated that he does not drive, and that his mother or grandmother shop for him. (Tr. 380-382.)

**IV.**   **Analysis**

    **A.**   **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[2]  A court may not decide the facts anew, reweigh the evidence, or substitute

---

[2]This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. Lexis 10163 (S.D. Ala. 1999).

> **B.  Discussion**

An individual who applies for Social Security disability benefits must prove his disability.  20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.  20 C.F.R. §§ 404.1520,

416.920.[3]

In the case sub judice, the ALJ determined that Plaintiff met the non-disability requirements for a period of disability and disability insurance benefits and was insured for benefits as of the alleged onset date. (Tr. 28). The ALJ concluded that while Plaintiff has the severe impairments of PTSD, borderline intellectual function and bursitis of the left hip and back pain, his impairments do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1,

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

Regulations No. 4.  (Tr. 29).  The ALJ found that Plaintiff's
allegations regarding his limitations were not totally credible (Tr.
26).  The ALJ also found that Plaintiff retains the residual
functional capacity ("RFC") for light and sedentary work, but cannot
bend and squat.  He further found that Plaintiff is mildly limited
in his ability to understand, remember and carry out detailed or
complex instructions, in his ability to deal with change in a
routine work setting and in his use of judgment in detailed or
complex work-related decisions.  He also found that Plaintiff is not
limited in his ability to respond appropriately to supervisors,
coworkers, and the general public, in his ability to understand,
remember and carry out simple one and two-step instructions,
maintain attention, concentration or pace for periods of at least
two hours, maintain social functioning and maintain activities of
daily living.  (Tr. 29).  The ALJ concluded that Plaintiff is able
to perform his past work as a construction worker, cook helper and
lumbar handler, and therefore is not disabled.  (Tr. 29).

    The evidence of record includes treatment records from the
Veteran's Administration dated June 2002 through 2006.  In a Central
Alabama Veterans Health Care Systems ("VA") Disability Evaluation
dated June 26 2002, Jamal Halim, M.D. noted that Plaintiff reported
low back pain for eight years, and intermittent back pain and with
radiation to his left lower extremity to his foot, with numbness in
his left leg.  Dr. Halim also noted that Plaintiff did not use a

8

cane, and had an occasional limp.  Plaintiff reported using over-the- counter medications.  On physical exam, Plaintiff had adequate pulses and no edema in his extremities, and 5/5 strength in all limbs.  Dr. Halim noted no atrophy or fasciculations, and normal muscle tone, stance and gait.  Plaintiff's musculoskeletal exam was normal except for mild tenderness and spasm over the lumbosacral region bilaterally, and positive straight leg raising bilaterally at 60 degrees.  (Tr. 138-139).

Plaintiff was treated at the VA on September 5, 2002.  He reported chronic lumbar pain and pain in his left hip that radiates into his left leg.  Plaintiff's physical exam was normal except for an elevated blood pressure, tenderness and spasms of the paraspinal muscles at L4B1 bilaterally, weakly positive straight leg raising on the left at 40 degrees, and numbness to his knee and posterior thigh.  He walked with an altered gait and could not walk on the toes of his left foot.  Lumbosacral x-rays showed straightening of the lordotic curve due to muscle spasm, small hyperlucent round and smooth, less than one cm, mass on the left cv area.  An x-ray of the left hip showed mild osteoarthritis of the acetabular joint.  He was diagnosed with lumbosacral strain, minimal osteoarthritis of the lumbosacral spine and mild osteoarthritis of the left acetabular joint.  (Tr. 166-168).

Plaintiff was treated at the VA on September 18, 2002.  He reported low back and left hip pain, radiating into his left leg.

(Tr. 154).  On physical exam, he had a "markedly abnormal" gait due to left hip pain, good range of motion and strength in his upper extremities, limited range of motion, especially on the left side, with left sided hip pain, positive straight leg raising on the right and left, and decreased sensation over the leg on the lateral side of the femur, and the lateral toes.  He was diagnosed with chronic left hip pain, mild left leg radicular symptoms, and mild chronic low back pain due to his chronic left hip pain.  (Tr. 160-161).

Plaintiff was treated at the VA on October 15, 2002.  He reported left hip pain for four to five years, with radiation down his leg and numbness in his foot.  On physical exam, Plaintiff had tenderness in his left sciatic notch, range of motion of 50% in his spine, and straight leg raising positive on the left.  X-rays of his left hip and lumbar spine were normal.  He was diagnosed with possible lumbar disc injury.  (Tr. 152).

Plaintiff was seen at the VA on November 27, 2002. He reported pain in his left hip. (Tr. 145).  On examination, a 10-20 mm nodule was noted on Plaintiff's left hip.  He complained of pain and numbness in his left thigh.  Plaintiff was referred to surgery for removal of the nodule.  (Tr. 147).

Plaintiff was referred for a VA surgery consult on March 7, 2003.  Lakshmipathi Namineni, M.D. found no swelling, normal hip movements and normal hip x-rays.  Plaintiff was diagnosed with trochanteric bursitis on the left.  Motrin 600 mg and Zostrix

ointment were recommended.  (Tr. 141).

Plaintiff was next seen at the VA on October 1, 2003. Plaintiff reported that he was out of medication for his hip pain. Plaintiff's physical exam was normal, except for mild-moderate tenderness on palpation of the lateral right hip.  He was diagnosed with trochanteric bursitis in his right hip.  (Tr. 287).

Plaintiff was next seen at the VA on January 11, 2005.  He reported sharp and throbbing left hip and low back pain, exacerbated by movement.  Dr. Iruvanti noted Plaintiff's history of trochanteric bursitis with occasional flare-ups.  He also opined that Plaintiff also has gastroesophagal reflux disorder ("GERD") and allergic rhinitis.   Plaintiff's physical exam was normal, and he was diagnosed with chronic left hip pain, likely trochanteric bursitis, that is never resolving.  Dr. Iruvanti noted a normal MRI in 2002, and that Plaintiff's GERD is stable on Zantac.  (Tr. 275-276).

Plaintiff presented to VA on July 28, 2005.  He reported that he had gone to the emergency room[4] for a kidney stone, and for  pain at the left lumbar area.  (Tr. 321-324).  Plaintiff was next seen at the  VA on August 9, 2005.  He reported constant pain in his

---

[4]Plaintiff was treated at the Selma Regional Medical Center on July 23, 2005.  He reported sudden onset of moderate left flank pain and vomiting.  His physical exam was normal except for tenderness in his abdomen and CVA tenderness on the left.  A pelvic CT was negative, and an upper abdomen CT showed a 6 mm stone in the lateral left duplicated ureter of the left kidney. Plaintiff was diagnosed with ureterolithiasis/renal colic. (Tr. 300-309).

lower back and left hip and leg that is shooting, sharp, aching, radiating and dull, and is exacerbated by movement. Upon examination, Plaintiff's extremities had no edema and were not tender. His pedal pulses were palpable and he had negative straight leg raising. He was diagnosed with left leg pain. (Tr. 315, 318). A lumbosacral spine x-ray on this date was essentially normal, showing a minor abnormality. (Tr. 312).

Plaintiff was next seen at the VA on February 14, 2006. He reported chronic hip and low back pain, and difficulty sleeping. He was seen by Dr. Iruvanti. Plaintiff's physical exam was normal, and he was diagnosed with insomnia, no depression; gingivitis; skin tag on face; allergic rhinitis, stable; and degenerative joint disease in hip and back. Dr. Iruvantia referred Plaintiff to VA Mental Health for treatment of insomnia. (Tr. 348, 358, 359). A Chronic Pain Assessment on this date reflects that Plaintiff has intermittent stabbing pain with movement that is alleviated by rest, repositioning and medication, and that it affects his sleep, mood, nutrition, normal work, and ability to concentrate. (Tr. 360-361).

Plaintiff was seen at the VA Mental Health on May 11, 2006. He denied auditory/visual hallucinations, and suicidal/homicidal ideations. He reported early morning awakenings with an inability to go back to sleep. On mental exam, FCRNP Joycelynn Lamont observed that Plaintiff had no agitation, his speech was clear, relevant and moderately paced, there was an absence of flight of

12

ideas, easy distractibility, loose association, and circumstantiality. She noted that he had an average level of intelligence, his insight/judgment was good, he had the ability to think abstractly, there was a low risk of harm to self or others, and he had no overt perceptual distortions. His memory was intact, mood was mildly anxious, and affect was congruent. He was diagnosed with anxiety disorder, insomnia, and was assigned a GAF of 60. (Tr. 349-350, 352-353).

The record also contains non-VA related medical records as well. Donald W. Blanton, Ph.D. prepared a report of a psychological evaluation dated March 21, 2003. During the evaluation, Plaintiff reported that his daily activities include doing light housework, but no cooking. Plaintiff also reported living with his brother and sister-in-law, having a few friends, and having a girlfriend that he sees twice a week. Plaintiff further reported that he seldom goes out, and that he has no hobbies. Dr. Blanton reported the results of the Wechsler Adult Intelligence Scale-III ("WAIS-III") as showing Plaintiff has a Verbal IQ of 75, a Performance IQ of 68 and a Full Scale IQ of 70, which is in the borderline range of intelligence. Dr. Blanton opined that Plaintiff appeared to be fairly well adjusted, despite his chronic pain. He diagnosed Plaintiff with borderline intelligence and pain disorder, without psychological features. (Tr. 172-175).

In a Mental Medical Source Opinion dated March 21, 2003, Dr.

13

Blanton opined that Plaintiff was markedly limited in his ability to understand, carry out, and remember detailed or complex instructions, and was mildly limited in his ability to understand, remember and carry out simple instructions, to maintain activities of daily living, and in his constriction of interests. He further opined that Plaintiff had no limitations in his ability to respond appropriately to supervision, co-workers, to customary work pressures, to respond appropriately to customers or other members of the general public, to use judgment in simple one or two step work-related decisions, to maintain attention, concentration or pace for periods of at least two hours, and in his degree of deterioration in personal habits. According to Dr. Blanton, Plaintiff has had a life-long low IQ. (Tr. 176-177).

In a report of a psychological evaluation dated June 2, 2004, Nina E. Tocci, Ph.D., noted that Plaintiff reported mental health treatment for one year after he returned from the Gulf War in 1991. On mental exam, Dr. Tocci noted that Plaintiff's affect was appropriate and stable, he was oriented to time, place, person and situation, and he demonstrated focused attention and scattered concentration. She reported that Plaintiff demonstrated thought content appropriate to mood and circumstances, he noted suicidal ideations, and he had negative memories of the war. She stated that Plaintiff demonstrated some insight into his behavior, and had the ability to make informed personal and financial decisions. Dr.

14

Tocci estimated that Plaintiff functions in the borderline to low average range of intellectual ability. (Tr. 266-268).

Dr. Tocci reported that the results of the WAIS-III show Plaintiff's Verbal IQ as 66, Performance IQ as 63 and Full Scale IQ as 62, which is considered to be in the mentally retarded range of functioning.  She diagnosed Plaintiff with PTSD, and assigned him a GAF of 60[5].  Dr. Tocci opined that Plaintiff was probably functioning in the low average to borderline range of intellectual ability at some point, evidenced by his high school graduation, completion of a course in carpentry, and enlistment in the Army. She also noted Plaintiff's significant symptoms of PTSD, and opined that he would have difficulty learning new information, integrating previously learned information with new information, and completing tasks in a timely manner. (Tr. 268-269).

Dr. Tocci completed a Mental Medical Source Opinion on June 8, 2004.  She opined that Plaintiff is markedly limited in his ability to respond appropriately to customers or other members of the general public, use judgment in detailed or complex work-related decisions, deal with changes in a routine work setting, and

---

[5]The Global Assessment of Functioning Scale is a 100-point scale that measures a patients overall level of psychological, social, and occupational functioning on a hypothetical continuum. A GAF of 51-60 indicates moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) or moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers ). See www.psyweb.com.  Last visited May 4, 2009.

understand, remember, and carry out detailed or complex instructions. She further opined that Plaintiff is moderately limited in his ability to respond appropriately to supervisors or co-workers, to use judgment in simple one or two step work-related decisions, to understand, remember, and carry out simple, one and two-step instructions, to maintain attention, concentration or pace for periods of at least two hours, and to maintain social functions. She opined that Plaintiff has no limitations in his ability to maintain activities of daily living. (Tr. 270-271).

In a report of a psychological evaluation dated October 11, 2005, Richard S. Reynolds, Ph.D., noted that Plaintiff reported psychiatric treatment for depression at the VA in 1991. Dr. Reynolds also noted that Dr. Tocci had diagnosed Plaintiff with PTSD in June 2004, and that progress notes from the VA dated January 11, 2005 show that his PTSD screening and depression screening were both negative. On mental exam, Dr. Reynolds observed that Plaintiff's affect was appropriate to content of thought and conversation, his recent and remote memory was fair, and his judgment, insight, and decision making abilities appeared intact. The WAIS-III test results revealed a verbal IQ of 65, a Performance IQ of 62 and a Full-Scale IQ of 61. Dr. Reynolds opined that Plaintiff had the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, co-workers, and work pressures in a work setting. Noting Plaintiff's Full-Scale IQ of 61,

indicating mild mental retardation, Dr. Reynolds opined that Plaintiff is functioning in the borderline or low average range of functioning, likely due to adaptive abilities.  (Tr. 326-328).

Dr. Reynolds completed a Mental Medial Source Opinion Form on October 11, 2005, in which he opined that Plaintiff is mildly limited in his ability to use judgment in detailed or complex work-related decisions, in dealing with changes in a routine work setting, and in understanding, remembering, and carrying out detailed or complex instructions, and has no other limitations. (Tr. 329-330).

In a report of a physical evaluation dated October 25, 2005, Huey Kidd, D.O. noted that Plaintiff reported back pain for ten years that is sharp and stabbing, but has no radiation of pain, numbness or tingling.  He also complained of headaches once or twice a week, with blurry vision, nausea and vomiting, and that they were relieved with Motrin.  On physical exam, Dr. Kidd observed that Plaintiff ambulates with a cane, but does not really need it, though he has a limp on the right.  Dr. Reynolds noted that Plaintiff had a full range of motion and 5/5 strength in his upper and lower extremities, that his deep tendon reflexes were intact at the brachial and at the patella reflex bilaterally.  He also noted negative straight leg raises, and that Plaintiff is able to heel walk and toe walk, and is unable to bend and touch his toes or squat and stand.  He diagnosed Plaintiff with low back pain, hip pain, and

borderline mental retardation.  Dr. Kidd opined that Plaintiff has very limited capabilities, mainly mental, and that his physical limitations are mild to moderate.  He opined that Plaintiff is not able to maintain function, based on the included psychological report.  (Tr. 331-332).

Dr. Kidd completed a Physical Medical Source Opinion on October 25, 2005, in which he opined that Plaintiff can stand/walk/sit 30 minutes at a time, can never lift/carry, climb, balance, stoop, kneel, crouch, or crawl, or work in high, exposed places, can occasionally work while exposed to vibration and in proximity to moving mechanical parts, and can frequently work in extreme cold or extreme heat, or in wetness/humidity.  (Tr. 333-335).

In an EMG study dated December 31, 2002, Physiatrist[6] Jeffrey K. Eng, M.D., noted that Plaintiff's physical exam revealed active range of motion in functional limits to his lower extremities and no muscle atrophy. Tenderness at the left greater trockanter was also noted.  Nerve conduction studies on bilateral peroneal, posterior tibial and sural nerves were normal, and EMG on muscles of the bilateral lower extremities and lumbar paraspinal showed no denervation potentials. Dr. Eng's impression was of normal EMG with no evidence of neuropathy or radiculopathy.  He noted that Plaintiff's pain was likely secondary to left greater trochanteric

_____

[6]Physiatry is a medical specialty that combines the specialties of physical medicine and rehabilitation.  See, www.physiatry.org.  Last visited September 10, 2009.

bursitis.  (Tr. 143).

Plaintiff was seen again by Dr. Eng on October 20, 2005. Plaintiff reported continued greater trochanteric pain, and low back pain without radiculation.  On physical exam, Plaintiff's gait appeared normal, and he had mild tenderness at his greater trochanter, and mild lumbar paraspinal tenderness at L4-S1, left greater than right.  No spasms were noted, and his lower extremity strength was intact.  He was diagnosed with chronic low back pain with left greater trochanteric bursitis, and referred for physical therapy.  (Tr. 343).

> **1.    Whether the ALJ erred in failing to find that Plaintiff meets Listing 12.05C.**

Plaintiff contends that the ALJ erred in finding that he did not meet Listing 12.05C.  According to Plaintiff, he has taken the WAIS-III on three separate occasions and each time the tests resulted in valid IQ scores between 60 and 70, which creates the presumption that he has had the mental impairment all his life. Plaintiff further asserts that while the ALJ found that Plaintiff met the first prong of Listing 12.05C, he erred in finding that Plaintiff did not meet the second prong, which requires that the claimant have an additional mental or physical impairment. Plaintiff asserts that the ALJ's finding that Plaintiff has the severe impairments of post traumatic stress syndrome and bursitis of the left hip and pain necessarily means that he determined that

these impairments significantly limits Plaintiff's ability to do basic work activities; thus, Plaintiff did meet the second prong of Listing 12.05C.  (Doc. 14 at 5-7).

In his response, the Commissioner contends that the ALJ's decision should be affirmed because Plaintiff did not meet his burden of proving that he met or equaled Listing 12.05C.  According to the Commissioner, Plaintiff failed to show deficits in adaptive functioning that were initially manifested prior to age 22.  In support of his assertions, the Commissioner notes Plaintiff's high school graduation and completion of trade school, and enlistment in the Army, all of which occurred prior to his twenty-second birthday. (Doc. 15 at 7).

In discussing Plaintiff's intellectual functioning, the ALJ stated as follows:

> After reviewing the inconsistencies in these two evaluations, from Dr. Blanton and Dr. Tocci, I do not give any weight to them or to the IQ scores.  Although they noted the scores were valid, they were not privy to the overall medical evidence and such inconsistencies at the time of their evaluation.  As the claimant had magnified his symptomatlgy to them as well as his consumption of alcohol and work activity, there exists the possibility of a parallel assumption that the claimant may not have performed at his best effort on IQ testing.
> ......................................................
>
> Dr. McKeown testified as a psychological expert at the hearing and stated that there were no records that reflected the claimant had mental retardation before the age 22.  Dr. McKeown also testified that the record reflected there was no indication of an event or events that are documented in the medical evidence that reflected the claimant had organic brain dysfunction and

would meet the requirements for Listing 12.2.  In fact,
Dr. McKeown opined that the claimant would not meet or
equal any of the listings......Dr. McKeown opined the
record reflected the claimant had intellectual
functioning that was above mental retardation all of this
life.  I give great weight to Dr. McKeown's testimony as
it is based on the entire medical evidence and the
testimony at the hearing
...................................................

Having considered 12.05C, I find, giving the claimant the
benefit of doubt, that the claimant meets only the first
prong, the IQ scores; however, I find that the overall
evidence does not find that the claimant meets the second
prong, or other physical or other mental impairments
imposing additional and significant work related
limitations of function.  I do not find that the
claimant's long term records reflect the claimant had a
physical impairment that would be of the level that would
be considered disabling.

(Tr. 23-27).

Listing 12.05, the listing category for mental retardation,
begins with an introductory paragraph, which states that "[m]ental
retardation refers to significantly subaverage general intellectual
functioning with deficits in adaptive functioning initially
manifested during the developmental period; i.e., the evidence
demonstrates or supports onset of the impairment before age 22." 20
C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. The listing
further provides that the "required level of severity for this
disorder is met when the requirements in A, B, C, or D are
satisfied." Id.  Subsection C requires a claimant demonstrate "a
valid verbal, performance, or full scale IQ of 60 through 70 and a
physical or other mental impairment imposing an additional and

significant work-related limitation of function." Id. at § 12.05©.
Section 12.00(A) states in pertinent part that [l]isting 12.05
contains an introductory paragraph with the diagnostic description
for mental retardation. It also contains four sets of criteria
(paragraphs A through D). If your impairment satisfies the
diagnostic description in the introductory paragraph and any one of
the four sets of criteria, we will find that your impairment meets
the listing." Id. at § 12.00(A) (emphasis added).

The Eleventh Circuit has determined that in order to be
considered for disability benefits under Listing 12.05, a claimant
must at least (1) have significantly subaverage general
intellectual functioning; (2) have deficits in adaptive
functioning; and (3) have manifested deficits in adaptive behavior
before age 22. Pettus v. Astrue, 226 Fed. Appx. 946, 2007 U.S. App.
LEXIS 8136 (11th Cir. April 5, 2007)(citing Crayton v. Callahan,
120 F.3d 1217, 1219 (11th Cir. 1997)). In addition, for presumptive
disability under 12.05( c), the claimant must have (1) a valid IQ
score of 60 through 70 inclusive, and (2) an additional mental or
physical impairment significantly affecting the claimant's ability
to work. Id. at 1219-1220.

Listing 12.05 does not require the Commissioner to make a
finding that the Listing is met based solely on the results of I.Q.
tests. See Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986).
I.Q. test results must be consistent with a plaintiff's daily

activities and behavior. Id.  Additionally, the Eleventh Circuit
has held that when a plaintiff presents a valid I.Q. score in the
range prescribed by Listing 12.05, then that plaintiff creates a
rebuttable presumption that the impairment is lifelong and existed
during the developmental period. Hodges v. Barnhart, 276 F.3d 1265,
1269 (11th Cir. 2001). Under Hodges, however, the Commissioner can
present activities in the daily life of a plaintiff to rebut the
presumption of a lifelong impairment. Id.

Based upon a careful review of the ALJ's decision, the
undersigned finds that the ALJ's finding that Plaintiff does not
meet Listing 12.05C is not supported by substantial evidence
because the decision is internally inconsistent.  In one portion of
the decision, the ALJ rejects Plaintiff's I.Q. scores as invalid,
and accords great weight to Dr. McKeown's opinion that Plaintiff
had intellectual functioning that was above mental retardation all
of his life. (Tr. 24).  However, later in the decision, the ALJ, in
discussing Listing 12.05C, states that he is giving Plaintiff the
benefit of the doubt, and finds that he meets the "first prong' of
the listing by virtue of his I.Q. scores.  Based on the Hodges'
decision, at that point, Plaintiff was entitled to the presumption
that mental retardation is a condition that remains constant
throughout life; thus he was not required to present evidence that
he manifested deficits in adaptive functions prior to age 22.
Hodges, 276 F.3d at 1266. The ALJ was then required to either

23

accept the presumption, or offer evidence to rebut the presumption. At that juncture, the ALJ did not point to any evidence to rebut the presumption, he instead went on to hold that Plaintiff did not meet Listing 12.05C because he did not have a mental or physical impairment imposing significant work related limitation. While the Commissioner argues that there is evidence in the record that demonstrates that Plaintiff had no deficits in adaptive functioning prior to age 22, the ALJ did not perform the required analysis upon giving Plaintiff the benefit of the doubt, accepting Plaintiff's I.Q. scores, and finding that he met the first prong of Listing 12.05C.  Because of the inconsistencies in the ALJ's decision, the undersigned cannot determine what the ALJ ultimately concluded with respect to Plaintiff's intellectual functioning.

This problem is compounded by the fact that the ALJ erroneously concluded that Plaintiff failed to present evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing 12.05C also requires evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." This means that the "work-related limitation of function" must be "significant," but it need not be a "severe impairment" as defined at Step 2:

> An impairment imposes significant limitations when its effect on a claimant's ability to perform "basic work activities" is more than slight or minimal. The question under Listing

24

> 12.05©, however, is not whether the
> impairment is in and of itself disabling, see
> Wright v. Schweiker, 556 F.Supp. 468,
> 476 (M.D. Tenn.1983); thus, "significant"
> requires something less than "severe" within
> the meaning of § 404.1520©. That
> "significant" involves something more than
> "minima"" but less than "severe" follows
> from the regulations. Once a claimant is
> found to have a "severe impairment" within
> the meaning of § 404.1520©, he is deemed
> disabled (he must also meet the durational
> requirement), and the analysis comes to an
> end. It is only when the impairment is not
> severe that the inquiry proceeds to determine
> whether the claimant is disabled under
> Appendix 1. A claimant is disabled under
> § 12.05© of the Appendix when the
> combination of the impairments renders
> the claimant severely impaired; that is,
> disabled. Thus, the impairment referred to in
> § 12.05© is something less than "severe" as
> defined in § 404.1520( c).

Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir.

1985); See also Cobb v. Barnhart, 296 F. Supp.2d 1295, 1297 (N.D.

Ala. 2003), (court held that the second prong of Listing 12.05

"imposes a less stringent requirement than that imposed by 20

C.F.R. § 404.1520( c).")

     At Step 2, the ALJ found that Plaintiff has severe impairments

of post traumatic stress syndrome, borderline intellectual

function, bursitis of the left hip and back pain. (Tr. 29),

Accordingly, in finding these severe impairments to exist, the ALJ

necessarily found  that Plaintiff has "a physical or other mental

impairment imposing an additional and significant work-related

limitation of function."  Thus, the ALJ erred in finding that

Plaintiff did not meet the second prong of Listing 12.05C. Accordingly, this case is due to be remanded as the ALJ's decision is not supported by substantial evidence[7].

**V.   Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, be **REVERSED and REMANDED.**

The attached sheet contains important information regarding objections to this Report and Recommendation.

**DONE** this **10th** day of **September, 2009.**

                                   _____/s/ SONJA F. BIVINS_____
                                       UNITED STATES MAGISTRATE JUDGE

---

[7]Because the undersigned finds that the ALJ's decision that Plaintiff does not meet Listing 12.05C is not supported by substantial evidence, there is no need to address Plaintiff's other assignments of error. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985) ("Because the misuse of the expert's testimony alone warrants a reversal, we do not consider the appellant's other claims.").

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

1.   **Objection**.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   <u>See</u> 28 U.S.C. § 636(b)(1)©; <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is

advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE.**